UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-2436-GW (JCx) | Date | April 13, 2017 |
|---|---|---|---|
| Title | *Meach Sovannara, et al. v. Hun Manet, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Katie Thibodeaux | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Nazareth M. Haysbert<br>Morton Sklar | John S. Purcell |

**PROCEEDINGS:** **EVIDENTIARY HEARING RE:**

**PLAINTIFFS' MOTION TO AMEND COMPLAINT UNDER FRCP 15, OR, IN THE ALTERNATIVE, FOR INTERVENTION UNDER RULE 24, OR JOINDER UNDER RULE 19 [48];**

**HEARING ON JURISDICTIONAL DISCOVERY AND PROPOSED LITIGATION PLAN**

The Court's Preliminary Comments on Plaintiffs' Offer of Proof re Evidentiary Hearing is circulated and attached hereto.

Evidentiary Hearing is held. The Court hears testimony from Sam Kim Hong, Sokahi Auon with certified Cambodian interpreter Vesna P. Loek and Detective David Ternullo.

Photo 11, Exhibits A and B are identified and admitted.

For reasons stated on the record, the above-entitled motions are TAKEN UNDER SUBMISSION. Court to issue ruling.

| | 1 | : | 45 |
|---|---|---|---|
| Initials of Preparer | JG | | |

<u>*Sovannara, et al. v. Manet, et al.*</u>, Case No. CV-16-2436-GW-JC
Preliminary Comments on Plaintiffs' Offer of Proof re Evidentiary Hearing

## I. Background

  Meach Sovannara ("Sovannara"), Jamie Meach ("Jamie"), and their three minor children, S.M., J.M., and S.M. (the "minor children") (collectively, "Plaintiffs"), sue Hun Manet ("Manet") and the Royal Kingdom of Cambodia ("Cambodia") for (1) torture through arbitrary, extra-legal, and long-term detention, under 28 U.S.C. § 1350; (2) acts of international terrorism, under 18 U.S.C. § 2331, *et seq.*; (3) intentional infliction of emotional distress; (4) assault; (5) battery; (6) false imprisonment; and (7) loss of consortium. *See generally* Compl., Docket No. 20. The causes of action arise from Sovannara's arrest, prosecution, and imprisonment in Cambodia for his participation in a political demonstration against the current Cambodian government.[1] *Id.* ¶¶ 2-3.

  Sovannara is a dual citizen of the United States and Cambodia, and is a resident of Long Beach. *Id.* ¶ 9. Jamie is Sovannara's wife, and is also a dual citizen of the United States and Cambodia, as well as a resident of Long Beach. *Id.* ¶¶ 9-10. The minor children are citizens of the United States and currently reside with Jamie in Long Beach. *Id.* ¶ 11.

  Manet is the oldest son of Cambodia's Prime Minister, Hun Sen, and holds several official roles within Cambodia's government, including Deputy Chief of Staff of the Royal Cambodian Armed Forces, and Vice-Commander of the Prime Minister's Personal Bodyguard Unit. *Id.* ¶ 12. He also serves as head of the military police and security forces. *Id.* Although Manet is a citizen of Cambodia and currently resides in Cambodia, Plaintiffs allege that he has been a long-term resident of the United States, including when he attended and graduated from West Point Military Academy in the 1990s. *Id.* Plaintiffs allege that it was in Manet's "official capacities, under his authority and jurisdiction and control, that the acts of torture against Plaintiff Meach Sovannara that are the subject of this lawsuit took place." *Id.*

  On July 29, 2016, Manet moved to dismiss the Complaint on the grounds that personal service on Manet was deficient, and also that there was no specific or general jurisdiction over him. *See* Mot. to Dismiss ("MTD"), Docket No. 24. On September 1, 2016, the Court held a

---

[1] A complete summary of the factual allegations surrounding Sovannara's imprisonment in Cambodia can be found in the Court's previous rulings in this matter. *See, e.g.*, Docket Nos. 33, 61. For purposes of the instant hearing, the Court summarizes only those allegations relevant to whether service of process on Manet was effected.

hearing and issued a Ruling in which it held that there was no specific jurisdiction over Manet. *See generally* Ruling, Docket No. 33.  However, the Court noted that there were factual discrepancies regarding Plaintiffs' attempt to personally serve Manet at the La Luna Restaurant (the "Restaurant") in Long Beach on April 9, 2016, particularly with respect to: (1) whether Manet (or his agents) had a role in an attack that took place on Plaintiffs' process server, Paul Hayes ("Hayes"), outside of the Restaurant; (2) whether Manet was aware that he was being served with legal papers at the time of the attack; and (3) whether Manet was intentionally attempting to evade service.  *Id.* at pages 9-10.  The Court also explained that it was unclear whether Manet had sufficient contacts with California and/or the United States that would warrant the exercise of general or nationwide jurisdiction over him.  *Id.*  As such, the Court granted Plaintiffs' request for jurisdictional discovery into these issues and stayed its Ruling on Manet's Motion to Dismiss pending the conclusion of discovery.  *Id.*

On February 6, 2017, the Court issued a Ruling and held a hearing regarding the results of jurisdictional discovery.  *See* Docket Nos. 48, 61.  After considering the submissions of the parties, the Court held that there was no general jurisdiction over Manet.  *See* Docket No. 61. With respect to service of process, the Court held the evidence submitted by Plaintiffs was insufficient to establish that Manet or any of his agents were aware that Hayes was attempting to serve Manet with legal documents, or that the person(s) who pushed Hayes was one of Manet's agents.  *See* Docket No. 61 at pages 7-14.  However, the Court indicated that it would re-evaluate its holding if Plaintiffs' could establish that the person(s) who blocked and pushed Hayes, thus preventing him from effectuating service of process, were Manet's agents and that Manet was sufficiently close-by at that point.  *Id.* at page 14 n.14.  The Court also emphasized that in any such re-evaluation, "there would still remain the issue as to the reason(s) for the bodyguard's actions in halting Hayes and pushing him back," because such a reaction would appear to be a normal bodyguard's response to prevent an oncoming individual from getting close to Manet. *Id.*  The Court thus scheduled an evidentiary hearing at which Plaintiffs could present evidence as to these issues.  *Id.*

Now pending before the Court is Plaintiffs' Offer of Proof regarding the evidence Plaintiffs intend to introduce at the hearing.  *See* Offer of Proof  ("Offer"), Docket No. 70.

**B. <u>Legal Standard</u>**

"Before a federal court may exercise personal jurisdiction over a defendant, the

2

procedural requirement of service of process must be satisfied." *Omni Capital Int'l Ltd v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987) (citing *Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 444-45 (1946)). Insufficient service can result in dismissal under Federal Rule of Civil Procedure 12(b)(5). Where a defendant challenges service of process under Rule 12(b)(5), the plaintiff bears the burden of establishing that the service complied with Rule 4. *See Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004) (citing *Butcher's Union Local No. 398 v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir. 1986)).

Federal Rule of Civil Procedure 4(e) provides that an individual may be served in a judicial district of the United States by:

> (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or
> (2) doing any of the following:
>     (A) delivering a copy of the summons and of the complaint to the individual personally;
>     (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who reside there; or
>     (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. Proc. 4(e).

The efforts of a process server attempting to effect service under Rule 4(e)(2)(A) must be "reasonably certain to inform those affected" of the action. *See Doe v. Qi*, 349 F.Supp.2d 1258, 1276 (N.D. Cal. 2004) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). The Ninth Circuit has emphasized that "[s]o long as a party receives sufficient notice of the complaint, Rule 4 is to be 'liberally construed' to uphold service." *Travelers Cas. & Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009) (citing *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1404 (9th Cir. 1994)). "However, 'neither actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction without substantial compliance with Rule 4.'" *Id.* (quoting *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986)).

"Sufficient service may be found where there is a good faith effort to comply with the requirements of Rule 4(e)(2) which has resulted in placement of the summons and complaint within the defendant's immediate proximity and further compliance with Rule 4(e)(2) is only prevented by the defendant's *knowing and intentional actions to evade service*." *Id.* at 1136

(emphasis added); *see also Qi*, 349 F.Supp.2d at 1307 ("Where a defendant attempts to avoid service[,] e.g.[,] by refusing to take the papers, it is sufficient if the server is in close proximity to the defendant, clearly communicates intent to serve court documents, and makes reasonable efforts to leave the papers with the defendant.").

### III. Plaintiffs' Offer of Proof

#### A. Previous Evidence Submitted by the Parties

As discussed in the Court's previous Rulings, Hayes attempted to personally serve Manet at the Restaurant on April 9, 2016, while Manet was in Long Beach as part of a goodwill tour. *See* MTD at 2:27-3:1. Although the parties disagree as to the specific details surrounding the event, according to Hayes, Hayes went to the Restaurant, where Manet was scheduled to attend a dinner, with the intention of serving Manet outside of the Restaurant. *See* Aff. of Paul Hayes ("Hayes Aff.") ¶ 2, Docket No. 18-1. Members of the Long Beach Police Department ('LBPD") were present at the Restaurant, and Hayes introduced himself to one officer, showed his identification, and informed the officer that he was there to serve legal papers on Manet. *Id.* ¶ 4. The officer obtained approval from a sergeant and allowed Hayes to proceed. *Id.* Hayes further explains that:

> At approximately 8:30 p.m., General Manet approached the entrance of the restaurant. When he was five to ten feet away from me, I extended my left arm, with my left hand holding the papers out in his direction, to get the papers close to him and deliver them to him. I called out, 'General Manet, General Manet.' Just as I was about to complete the delivery of the documents into General Manet's hands, a bodyguard accompanying the General grabbed me from behind, picked me up, and violently threw me to the ground. The attack by the bodyguard prevented me from putting the documents into General Manet's hands. The documents dropped to the ground as a result of the violent attack on me. I was unconscious for 30 seconds to a minute. When I came to, I was paralyzed and could not move my body . . . . An ambulance took me to the hospital, where I was admitted into the intensive care unit. I had serious injuries, including bruising on my spinal cord and abrasion on the top of my head. I spent five days in the hospital. My injuries may be permanent.

*Id.* ¶¶ 5-8.

Manet contends that no actual service took place because Manet never actually received the papers and was not informed that the papers were legal documents. *See* MTD at 5:9-17, Docket No. 24. In support, Manet submitted a declaration stating that he was not aware anyone

4

had attempted to approach him and hand him legal papers until the day after the incident (April 10, 2016) when Manet was alerted about news articles describing the incident. *See* Decl. of Hun Manet ("Manet Decl.") ¶ 6, Docket No. 25. At that point, he allegedly learned that a process server had attempted to serve him with legal papers. *Id.* ¶ 7.

Plaintiffs, on the other hand, dispute whether Manet was unaware that the process server was attempting to serve him with legal papers. Plaintiffs argue that "[Manet] had arranged for a personal bodyguard unit to accompany him on his visit to the United States and to Long Beach in part because of his prior knowledge of the lawsuit and the likely service of process attempt." *See* Opp'n at 6:19-27, Docket No. 29. In support, Plaintiffs contend that "reports were widely circulated in the media prior to [Manet']s visit to Long Beach about the lawsuit that was being filed against him, and [Manet] may well have had prior notice of these reports especially as the subject of his visit to Long Beach had become very controversial, and he had received a substantial amount of media coverage and public criticism." *Id.* at 8:4-14. Plaintiffs further contend that it was at "the exact point of delivery of service to [Manet] that the purposeful and most likely pre-planned interference with the delivery of service was carried out by [Manet's] personal bodyguards in an extremely violent and damaging way." *Id.* at 9:11-24.

In light of the factual discrepancies surrounding Hayes' service of process attempt, the Court granted Plaintiffs' request for jurisdictional discovery in order to determine "what knowledge and understanding [Manet] actually had about what was taking place in connection with the attack on the process server, and the fact that he was the subject of judicial proceedings in the present case." *See* Opp'n at 6:8-18.

After jurisdictional discovery concluded, the parties submitted supplemental briefs, and Plaintiffs submitted photographic and video evidence which Plaintiffs argued established that "Manet's agents made a direct and forceful attempt to interrupt, interfere with, and prevent completion of service of process, in violation of federal and state criminal law that make assault on a process server a violation of law." *See* Pl.'s Br. at 1:12-24, Docket No. 54. Plaintiffs contended that this evidence established the following facts: (1) Hayes identified himself to Long Beach Police Department officers upon arrival at the Restaurant and obtained their approval for carrying out service of process at the site, which allegedly "was done openly, within view of members of [] Manet's security team, also present at the site"; (2) there were three types of security personnel at the Restaurant tasked with providing protection for Manet, including

5

security officers hired by the Restaurant, five security officials accompanying Manet from Cambodia, and more than two dozen of the Cambodian American community voluntarily providing security services for Manet;[2] (3) Hayes was present at the scene for three hours before the incident, and, because he had informed the Long Beach Police Department officers of his intention to serve Manet and displayed court documents, "it is reasonable to assume that [] Manet's security team, who also were present during that period, more than likely were aware of the purpose of his presence"; (4) when Manet arrived, Hayes approached Manet with his hand outstretched "so that his purpose was clearly visible to Manet's security team members"; (5) that Hayes came within 5 to 10 feet of Manet "with the court papers clearly visible in the video and still photos in his outstretched hand," when Manet's security team forcibly grabbed him and threw him "more than 20 feet;" (6) although the court documents never reached Manet's hands, the visual images confirm they were at the point of being delivered when Hayes was attacked. *Id.* at 11:4-13:6.

Defendants, on the other hand, argued that service was inadequate because Hayes at no point attempted to clearly communicate his intent to serve legal documents.[3] *See* Def.'s Br. at 2:21-3:6, Docket No. 55. Defendants contended that Manet was unaware that a lawsuit had been filed against him at the time Plaintiffs attempted service, which is evidenced not only by the fact that the lawsuit had only been filed the day before the service attempt, but also by Manet's declaration stating that he was unaware a lawsuit had been filed against him, never attempted to evade service, and never informed anyone to attack Hayes. *Id.* at 4:13-22; Manet Decl. ¶¶ 7, 11. Defendants further pointed out that the photographs submitted by Plaintiffs do not provide any evidence that the man who pushed Hayes worked for Manet or that Manet or any of his security team was aware that Hayes was attempting to serve Manet.[4] *See* Def.'s Br. at 5:2-6:26.

---

[2] As to the alleged three types of security personnel at the Restaurant at the time of the incident, the Court indicated in its February 6, 2017 Ruling that it is unclear whether all three of them can be considered agents of Manet such that their actions can to attributed to him. *See* Docket No. 61 at page 9 n.3. While certainly the five security officials accompanying Manet from Cambodia can be held to be his agents, the Court held that it could not see any reason to find the security officers hired by the Restaurant or the two dozen members of the Cambodian American community to be similarly situated. *Id.* Plaintiffs have yet to address this issue.

[3] It is noted that in his declaration, Hayes only stated that, as he was approaching Manet, he held out papers in his left hand and shouted "General Manet, General Manet." Hayes Affidavit at ¶ 5, Docket No. 18-1.

[4] While Hayes states that the person who grabbed him was "a bodyguard accompanying the General" (Hayes Affidavit at ¶ 6), it is unclear how or why Hayes formed the conclusion that the person who grabbed him was one of

After reviewing the exhibits submitted by Plaintiffs, *see* Decl. of Morton Skylar ("Skylar Decl.") Exs. A-D, Docket Nos. 54-2-5, as well as the video evidence subsequently lodged with the Court, *see* Docket Nos. 58-59, the Court agreed with Defendants that there was insufficient evidence indicating that Manet or any of his agents were aware that Hayes was attempting to serve Manet, or that the person(s) who pushed Hayes was one of Manet's agents.[5] The exhibits originally submitted with Plaintiffs' Supplemental Brief consisted of news articles discussing Manet's planned visit to Long Beach and reporting on the subsequent attack on Hayes, *see* Skylar Decl. Ex. A; email communications between the Long Beach Police Department and Hayes regarding Hayes' public request for surveillance related to the incident, *see* Skylar Decl. Ex. B; and photographs depicting the parking lot of the Restaurant, which did not show any individuals or depict the at-issue events, *see* Skylar Decl. Ex. C. The Court held that none of those exhibits provided any concrete evidence indicating that Manet or his agents were aware that Hayes was trying to serve Manet with legal documents.

Similarly, the Court held that the video evidence of the event (without more) did not support Plaintiffs' contentions. Plaintiffs had lodged two videos with the Court: (1) surveillance footage from Long Beach Police Department cameras positioned in various locations around the Restaurant on the date of the incident; and (2) the aforementioned disc labelled "Still Photos from La Lune Video," footnote 6, *supra*. *See* Pl.'s Supp'l Lodging, Docket Nos. 58-59. The Court explained that the video footage from the Long Beach Police Department surveillance cameras were all taken from very distant viewpoints, and do not even appear to show the relevant incident. Indeed, Plaintiffs appeared to concede this, stating that "[a]lthough the police surveillance videos are nowhere near as close-up or as clear as the witness video, the images they contain are important because they provide additional documentation of the authenticity of the witness video." *See* Pl.'s Supp'l Lodging at 2:23-25, Docket No. 59.

---

Manet's bodyguards rather than one of the five security officers hired by the Restaurant or one of the two dozen Cambodian American community volunteers.

[5] Because of their central importance to resolving the issue, the Court reviewed at least ten times the relevant portions of the video of the attempted service by Hayes. *See* dvd disc labelled "Still Photos from La Lune Video" (which includes a number of photographs and videos) that was lodged with the Court on January 24, 2017. Docket No. 59. In the video of the attempted service (which is labelled "Service of Process video.MOV," henceforth "service video"), the period of primary interest starts at the "37" seconds mark and proceeds to the "47" seconds mark. Additionally, the dvd contains 17 photographs (marked as "01.jpg" to "17.jpg") which were taken from that portion of the video.

7

The set of witness images from the second video depict a large crowd gathering outside the Restaurant and show an individual, whom Plaintiffs claim is Hayes, waiting at the back of the crowd gathered in front of the Restaurant. The video depicts Hayes approaching from the back of the crowd with a manila envelope raised above his head, and, shortly thereafter, falling backwards away from the crowd with the envelope still in his hand. The Court explained that it is entirely unclear from the images who pushed Hayes, nor is it clear where Manet (or his bodyguard/agents) was located at that point in time. *See* Pl.'s Supp'l Lodging, Docket No. 58.

Moreover, the Court held that Hayes' own declaration and deposition testimony indicate that he never communicated his intent to serve court documents to Manet or his agents. Hayes' Declaration states that he only called out "General Manet, General Manet," before he was pushed by someone in the crowd. *See* Hayes Decl. ¶¶ 5-6, Docket No. 18-1. Additionally, at his deposition in this matter, Hayes testified about the incident as follows:

> Q: How long before April 9, 2016, did you get this assignment?
> A (Hayes): It might have been – I have to double check, but it's very possible it was the day before. I believe it was the day before, meaning April 8th, I believe, I got the assignment.
> Q: And who did you tell about the assignment when you got it?
> A: Who did I tell about the assignment? I don't recall telling anyone. I mean, I received the assignment, and I – then I worked it. That's all I recall.
> Q: Are you aware of anybody who alerted General Manet about the lawsuit that's at issue here today prior to your attempt to serve him on April 9th?
> . . .
> A: I wasn't aware of anything.
> Q: Shortly before you tried to serve General Manet, you did tell the Long Beach Police Department you were going to try to serve, correct?
> A: Yes. I did on two different occasions.
> Q: What were the two occasions?
> A: Okay. Well, there [sic] were a couple hours apart. I can't remember the specific time. There was a – the first time was several hours before General Manet arrived. There were a group of four Long Beach Police Department officers standing in the line.
>   I walked over to them. I showed them my subpoena and identification and explained why I was there, and I wanted them to know what I was doing so that no one would be alarmed as I would eventually approach General Manet.
>   And – oh, and then, so that was the first one. Then it was

8

> getting more crowded, and it was apparent that things were about to happen. The crowd was getting a bit more frenetic.
>
> And I observed – what appeared to be a Cambodian Long Peach Police Officer. So this is a couple hours after the first notification that I just explained.
>
> I did the same thing. And he said, "Hold on, let me talk to my supervisor."
>
> I walked – I watched him walk to the opposite side where protestors were lined up and pointed at me and looked at me and waved, and he came back.
>
> He said, "Okay fine. You're good to go," because I was on the – I was standing in the area where – in front of the restaurant away from all the protestors.
>
> . . . .
> Q: Other than the police officers, did you tell anybody else that you were going to try to serve General Manet?
>  . . . .
> A: No. Oh, wait a minute, wait a minute. I remember just talking to – when I first got there, talking to the protestors and just asking them, you know, trying to get information from them.
>
> And you know, those are the only other people that I talked to, trying to find out, you know, if they knew when he was showing up, how he would show up, and you know, most of them thought he was going to show up, so basically, I was trying to get information.
> . . . .
> Q: Are you aware of the Long Beach Police Department telling General Manet that you were going to try to serve him?
> A: **Absolutely not. I don't think that was even possible, especially when they blew me off, yeah.**
> . . . .
> Q: Do you think that would have made your job more difficult if they had told him that you were going to try to serve him with process?
> A: I don't think it would have made any difference considering how the events unfolded. I don't think it would have made any difference.
> Q: Why is that?
> A: Because it was difficult to begin with.

*See* Decl. of John Purcell Ex. A at 21-28, Docket No. 55-2 (emphasis added). The Court explained that Hayes' own testimony indicates that neither he, nor the LBPD, ever informed Manet or his agents that Hayes was attempting to serve legal papers on Manet.

Finally, the Court pointed out that the circumstances of this case are factually on point with a similar case, which held that service had not been properly effected on a foreign Cardinal

9


visiting the United States. *See Weiss v. Glemp*, 792 F.Supp. 215 (S.D.N.Y. 1992). In *Weiss*, the Cardinal was informed that when he arrived in the United States, he would be served with a complaint and required to appear in court on defamation charges. *Id.* at 217. While in the United States, the Cardinal attended a procession, during which time a process server approached him and attempted to serve the summons and complaint; the process server attempted to hand the Cardinal the papers, but a man standing next to the Cardinal deflected the papers before they reached the Cardinal. *Id.* at 222. The court held that the attempted service was inadequate, because there was no indication that the Cardinal was attempting to evade service or was aware the papers were legal documents – the court pointed out that the papers proffered by the process server could easily have been a petition, leaflet, protest, or other non-legal document. *Id.* at 225. It was emphasized that the process server "at no time made it clear she was serving legal process. She did make it clear by her actions that she was intent on giving something to [the Cardinal]. She did not make it clear to other individuals who were present but unconnected with her that those papers were legal process, nor did she make it clear she was an officer of the court." *Id.* at 224; *see also Ohio Farmers Ins. Co. v. Wagner*, No. 1:13-cv-1553, 2013 WL 5739756, at *2 (N.D. Ohio Oct. 22, 2013) ("The process server must identify the nature of the papers to the individual she is serving."); *cf. Qi*, 349 F.Supp.2d at 1274 (finding that process server sufficiently identified nature of the documents by holding out papers to foreign official and stating, "You can accept them or you do not have to, but you have been formally served by the U.S. District Court of Northern California.").

As explained in the Court's February 6, 2017 Ruling, here, as in *Weiss*, it is clear that Hayes never identified the papers in his hand as legal documents. Nor, after the conclusion of jurisdictional discovery, was there any actual evidence that Manet or his agents were aware Hayes was attempting to serve legal documents. The Court thus tentatively granted Manet's Motion to Dismiss.

### B. *Evidence to be Presented at Evidentiary Hearing*

#### 1. Burden of Proof

As an initial matter, in the Offer of Proof, Plaintiffs repeatedly assert that in the absence of any material evidence submitted by the Defendant establishing his assertion that service was insufficient, "the allegations being made by the Plaintiffs regarding [] Manet being held responsible for the interference with service of process that took place with the attack on process

server Paul Hayes, must be taken as true for the purposes of establishing effective service of process and the jurisdiction of the Court over these proceedings." *See* Offer at 4:8-20; 5:9-17. In support, Plaintiffs cite to two cases that merely delineate the general standard for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and thus are not relevant to the burden of proof Plaintiffs bear on a motion to dismiss under Rule 12(b)(5) where the court has ordered an evidentiary hearing. *Id.* (citing *W. Ctr. for Journalism v. Cederquist*, 235 F.3d 1153 (9th Cir. 2000) and *Two Rivers v. Lewis*, 174 F.3d 987 (9th Cir. 1999)). To avoid any confusion at the evidentiary hearing, the Court will delineate Plaintiffs' burden before summarizing the evidence Plaintiffs intend to introduce.

Where a motion to dismiss based on jurisdictional grounds is "based on written materials rather than an evidentiary hearing, the plaintiff [must] make a prima facie showing of jurisdictional facts." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal quotation and citation omitted). "Although the plaintiff 'cannot simply rest on the bare allegations of its complaint,' uncontroverted allegations in the complaint must be taken as true." *Id.* (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)); *see also Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) ("If the court determines that it will receive only affidavits or affidavits plus discovery materials, these very limitations dictate that a plaintiff must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss.").

However, where the motion to dismiss raises factual issues that require an evidentiary hearing, the Plaintiffs' burden raises to a preponderance of the evidence. As the Ninth Circuit has emphasized, "[i]ssues of credibility or disputed issues of fact may require an evidentiary hearing." *See Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). "If the pleadings and other submitted materials raise issues of credibility or disputed questions of fact . . . the district court has discretion to take evidence at a preliminary hearing in order to resolve the contested issues." *Spring Patents, Inc. v. Avon Rubber & Plastics, Inc.*, 183 F.Supp.2d 1198, 204 n.4 (D. Haw. 2001) (citing *Data Disc*, 557 F.2d at 1285); *see also Larsen v. Lauriel Invs., Inc.*, 161 F.Supp.2d 1029, 1046 (D. Ariz. 2001) (holding that "the court has discretion to rely on written submission or to hold a full evidentiary hearing"). "In this situation, when the plaintiff is put to his full proof, the plaintiff must establish the jurisdictional facts by a preponderance of the evidence, just

11

as he would have to do at trial." *Id.*; *see also Authentify Patent Co., LLC v. StrikeForce Techs., Inc.*, 39 F.Supp.3d 1135, 1142 (W.D. Wash. 2014) ("Where, as here, the district court has allowed the parties to conduct discovery on the jurisdictional issue and held an evidentiary hearing, the plaintiff must prove that jurisdiction exists by a preponderance of the evidence." (citing *Data Disc*, 557 F.2d at 1285)).

Thus, at this juncture, the burden of proof is on Plaintiffs to establish by a preponderance of the evidence that service of process was effected.[6]

### 2. Plaintiffs' Proffered Evidence

#### a) *Perpetrators of the Attack on Hayes*

Plaintiffs indicate that they have subpoenaed the suspected principal perpetrators of the attack on Hayes, two individuals named San Kim Hong and Khavy Nuon, to testify as to the following matters: (a) confirming that they are the individuals pictured in the photographic images depicting the incident which were previously submitted to the Court; (b) "that for facial identification comparison purposes they are the individuals pictured in their own social media postings"; (c) that they were performing security services for Manet during the incident; (d) that they have previously carried out security functions for Manet and the Cambodian government; (e) that they have personal and professional connections to Manet; and (f) that they were on site at thhe Restaurant prior to the incident and observed Hayes "and the fact that he had documents in his possession that could well have been related to the service of process functions." *See* Offer at 3:4-25.

Plaintiffs also indicate that, based on the ongoing criminal investigation of the attack by the Long Beach Police Department, these two witnesses may exercise their Fifth Amendment right against self-incrimination and refuse to provide substantive testimony. *Id.* at 4:3-8. Plaintiffs indicate that they have "alternative sources" to establish the points delineated above, but also claim that if these witnesses refuse to testify, the allegations made by Plaintiffs regarding the incident (and the points delineated above) must be taken as true. *Id.* at 4:5-20; 5:18-24. Plaintiffs cite to no authority for this proposition, other than the general citations to

---

[6] Indeed, Plaintiffs themselves requested jurisdictional discovery in order to obtain more factual information related to whether service of process was proper. *See* Pls. Mot. to Initiate Jurisdictional Discovery, Docket No. 23 (requesting jurisdictional discovery and arguing that the "Court cannot properly consider [Manet's Motion to Dismiss] without the more comprehensive factual information that only jurisdictional discovery can provide."). Plaintiffs cannot now take the position that their allegations regarding the service of process attempt must be taken as true.

cases discussing the standard for a motion to dismiss, as discussed *supra*.

### b) Testimony by Plaintiffs' Counsel

Plaintiffs also indicate that Plaintiffs' counsel, Morton Skylar, will present testimony regarding the LBPD's criminal investigation into the incident based on Skylar's communications with the LBPD. *Id.* at 6:19-7:7. Plaintiffs assert that the lead detective on the investigation, LBPD Detective David Ternullo, has expressed an unwillingness to provide information regarding the investigation, and thus Plaintiffs will call Skylar instead.[7] *Id.* Plaintiffs contend that Skylar can provide information regarding the LAPD's use of facial recognition techniques to confirm the identities of the principal perpetrators of the attack; assistance the LAPD provided to Plaintiffs to establish the legal residences of the perpetrators; details regarding the LAPD's ongoing investigation; and that Hayes indicated to the LBPD and to others at the Restaurant that he was intending to service process on Manet. *Id.* at 7:8-20.

### c) Testimony by Members of the Cambodian-American Community

If time permits, Plaintiffs indicate that they will call as witnesses, or otherwise present evidence from, two members of the Cambodian-American community, who are not presently identified for safety reasons. *Id.* at 9:4-10:2. Plaintiffs contend that these individuals will provide information regarding the alleged perpetrators' connections to Manet, and the perpetrators' roles in providing security for Manet. *Id.*

### d) Testimony from the California Association of Licensed Investigators

Finally, Plaintiffs indicate that they intend to call as a witness, or present information from, Jan Tucker, who is purportedly an elected official of the California Association of Licensed Investigators. *Id.* at 10:4-17. Tucker will provide information regarding the history and purpose of the California law making it illegal to assault a process server. *Id.* The Court is already aware of this information, and it is unclear why it is relevant to the issues that the Court has indicated will be resolved at the hearing.

---

[7] There would appear to be an initial hearsay problem with the Plaintiffs' proposed use of Sklyar to establish the facts regarding the LBPD's investigation of the matter.